IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 07-cv-00644-WDM-CBS

EDWARD J. KERBER, *et al.*,

    Plaintiffs,

v.

QWEST GROUP LIFE INSURANCE PLAN, *et al.*,

    Defendants.

## AMENDED ORDER ON MOTION TO DISMISS

Miller, J.

    An Order on Motion to Dismiss (Docket No. 45) was entered on February 22, 2008. To correct an error occurring on page 10, the following Amended Order is entered to replace the previous Order.

    This matter is before me on Defendants Qwest Group Life Insurance Plan (the "Plan"), Qwest Employees Benefit Committee, Qwest Plan Design Committee, Qwest Communications International, Inc. ("Qwest"), and Prudential Insurance Company of America's (collectively "Defendants") Motion to Dismiss (Docket No. 16). After a review of the pleadings and the parties' written arguments, I conclude oral argument is not required. For the reasons that follow, the motion is granted.

### Background

    This case centers around the life insurance plan (the "Plan") Qwest provides to

PDF Final

its employees.[1]  Qwest and its predecessors have provided some variation of the Plan to its employees since 1957.  Until October 2005, the Plan included a reduction phase wherein a participant's benefit was reduced to 50 percent of the benefit available at retirement.  Generally, the formula called for a 10 percent reduction each year for five years beginning on the participant's 65th or 66th birthday until the benefit amount was 50 percent of the benefit available at age 66.  In September 1997 US West added an alternative minimum benefit to the Plan's reduction calculations.  In a letter dated September 25, 1997, US West informed plan participants of the change stating it was "raising the minimum retiree basic life insurance benefit to $20,000 for the beneficiaries of retirees dying on or after December 31, 1996."[2]  The governing documents for the Plan incorporating the change were issued in June 1998 ("1998 Plan Documents").  These documents state:

---

[1] The Plan was previously maintained by U.S. West Communications, Inc. ("US West").  In July 2000, US West merged with Qwest with Qwest as the surviving company.  Therefore, some of the named plaintiffs who retired prior to the merger retired from US West rather than Qwest.  However, the Plan at issue is the same regardless of when and from which company the plaintiffs retired.

[2] Generally, when documents not attached to the complaint are considered in a motion to dismiss, the motion to dismiss is converted to a motion for summary judgment.  *GFF Corp. V. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("A 12(b)(6) motion must be converted to a motion for summary judgment if 'matters outside the pleading are presented to and not excluded by the court.'").  However, when the complaint refers to a document and the document is "central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."  *Id.*  In this case, Plaintiffs' Amended Complaint refers extensively to governing plan documents, the September 25, 1997 letter, and other materials relating to the Plan.  The parties agree that the Plan documents may be considered in the motion to dismiss because they are central to Plaintiffs' claims and are referred to in the Amended Complaint.

> On the first day of the month coinciding with or next following the date upon which an Eligible Retiree[3] attains age 66, the amount of Basic Life Coverage in effect at retirement shall be reduced annually by 10 percent until the last day of the month in which an Eligible Retiree attains age 70, at which time, such Eligible Retiree's Basic Life Coverage shall remain at 50 percent of the Basic Life Coverage amount in effect prior to his 66th birthday. Notwithstanding the foregoing, for certain Eligible Retirees, such Basic Life Coverage amounts shall not be reduced below certain minimum amounts set forth in Appendix 7 or such coverage shall be augmented with Grandfathered Benefits as set forth in Appendix 3.

Appendix 7 states that a minimum benefit "shall apply to certain Eligible Retirees" and sets the minimum benefit as follows:

> (a) The Basic Life Coverage amount for an Eligible Retiree who retires before January 1, 1996 and dies after December 31, 1996 shall not be reduced below $20,000.
>
> (b) The Basic Life Coverage amount for an Eligible Retiree who retires on or after January 1, 1996 shall not be reduced below $30,000.[4]

Therefore, the 1998 Plan Documents set up a reduction phase where the benefit amount is reduced annually for five years but, in any case, not below the greater of 50 percent of the benefit available at age 66 or the minimum benefit amounts prescribed by the Plan.

The 1998 Plan Documents also contain a clause relating to the amendment of the Plan ("Reservation of Rights Clause"). It states as follows:

> <u>Amendment.</u> Except to the extent limited by an applicable collective

---

[3] An "Eligible Retiree" is defined in the 1998 Plan Documents as "those Retired Employees . . . who meet the eligibility requirements set forth in [the 1998 Plan Documents]."

[4] I will refer collectively to the clause setting forth the benefit formula and Appendix 7 as the "Benefits Clause." I will refer to the minimum amount of benefits articulated in the Benefits Clause as the "Minimum Benefit Promise."

PDF Final 3

bargaining agreement, the Company reserves the right, in its sole discretion, to amend the Plan at any time, in any manner, including, without limitation, the right to amend the Plan to reduce, change, eliminate, or modify the type or amount of Benefits provided to any class of Participants. Moreover, unless otherwise explicitly provided in a Contract, no amendment shall be made to the Plan without the consent of the Company. Any such amendment of the Plan shall be effective on such date as the Plan Sponsor may determine; provided, however, that no amendment shall reduce the benefits of any Participant with respect to a loss incurred prior to the date such amendment is adopted.

Both US West and Qwest reinforced the minimum benefits amounts at numerous times after the 1998 Plan Documents were adopted when they communicated with Plan participants regarding the Plan. For example, during the merger proceedings a Summary Plan Description ("SPD") was placed on the US West internal website stating that (1) the Basic Life insurance coverage for those who retired before January 1, 1996 "will not reduce below" the minimum amount of $20,000 and (2) the Basic Life insurance coverage for those who retire after December 31, 1995 and who retire after the age of 65 will reduce according to the formula until age 70 at which time it will continue at 50% of the initial amount "but no less than $30,000." After the merger, Qwest sent an SPD in January 2001 with the same statements.

In October 2005, Qwest announced that it was amending the Plan to reduce the amount of basic life insurance coverage to $10,000 for all occupational retirees.[5] This same change was announced for all management retirees in October 2006. Plaintiffs allege that these changes were adopted in Amendment 2006-1 ("Plan Amendment") on

---

[5] It appears that an "occupational retiree" is a retiree who retired from a non-management, non-salaried position. *See* 1998 Plan Documents at 6 (defining an "occupational employee" as "a Bargained Employee or non-management, non-salaried Employee").

PDF Final 4

December 13, 2006 but applied retroactively to January 1, 2006.

Subsequently, Plaintiffs filed this lawsuit seeking for themselves and "all other Plan Participants and Beneficiaries . . . a panoply of declaratory, temporary, preliminary and permanent injunctive and other equitable relief."[6] (Compl. ¶ 6.) At issue in this Motion to Dismiss are Plaintiffs' claims that Defendants are contractually barred and equitably estopped from reducing the minimum life insurance benefit for Eligible Retirees. Defendants argue that the Reservation of Rights Clause and the wording of the Benefits Clause allow them full discretion to amend or modify the Plan including reduction of any minimum life insurance coverage articulated in the 1998 Plan Documents.

Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) alleges that the complaint fails "to state a claim upon which relief can be granted." A complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). "Factual allegations must be enough to raise a right to relief above the

---

[6] Plaintiffs also seek class certification for all Eligible Retirees. *See* Amended Mtn. to Certify Class (Docket No. 21).

speculative level." *Id.* The court must accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996).

Discussion

Plaintiffs claim, *inter alia*,[7] that Qwest is barred from reducing the life insurance benefit both because it is contractually barred under the language in the 1998 Plan Documents and because it is equitably estopped under the language in the 1998 Plan Documents and the SPDs. Defendants argue that both of these claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because the Plan unambiguously authorizes Defendants to reduce or eliminate life insurance benefits. I will address each of Plaintiffs' claims in turn.

1. Contractual Bar

"ERISA regulates two types of benefits plans, pension benefit plans that create vested rights and welfare benefit plans that need not create vested rights." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 130 F.3d 950, 954 (10th Cir. 1997) (citing *Chiles*, 95 F.3d at 1510); 29 U.S.C. §§ 1002(1), (2). Life insurance benefits are welfare benefits,[8] 29 U.S.C. § 1002(1), and "[b]enefits provided under a welfare benefit

---

[7] Plaintiffs present many other claims in their Amended Complaint including claims for breach of fiduciary duty beyond reducing life insurance benefits, claims that the retroactive application of the Plan Amendment was in violation of the contract terms, and claims by individual Plaintiffs regarding the circumstances surrounding their retirement. These claims are not at issue in this Motion to Dismiss.

[8] The parties agree that the life insurance benefit provided by Qwest is a welfare benefit.

plan need never vest." *Chiles*, 95 F.3d at 1510. Indeed, "[a]n employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits." *Chiles*, 95 F.3d at 1510. Such a contractual agreement for vested rights "'must be incorporated, in some fashion, into the formal written ERISA plan'" including SPDs. *Id.* at 1511 (quoting *Jensen v. SIPCO*, 38 F.3d 945, 949 (8th Cir. 1994)). Furthermore, "[c]ontractual vesting of a welfare benefit is an extra-ERISA benefit that 'must be stated in clear and express language.'" *Id.* at 1513. Therefore, Plaintiffs "bear the burden of showing an agreement or other demonstration of employer intent to have company-paid premiums vest under the plan." *Id.* at 1511.

In determining if Plaintiffs have stated a claim upon which relief may be granted, I must consider the terms of the ERISA plan "as a whole and, if unambiguous, . . . construe them as a matter of law." *Id.* at 1511. Specifically, "the question is not whether an ERISA plan document containing apparently conflicting provisions is ambiguous in toto. Rather, it is whether the reservation of rights clause itself, read in tandem with the promise of [minimum benefits], is ambiguous with respect to the rights of the participants. . . ." *Id.* at 1511–12.

In this case, the Plan contains both a promise to maintain life insurance benefits at certain minimum levels and an express reservation of rights clause. Defendants argue that this situation is exactly analogous to the situation in *Chilies* in which the Tenth Circuit determined that the sponsor retained the ability to modify long term disability benefits. Plaintiffs argue that although the situation here is similar to that in *Chiles*, *Chiles* actually bars Qwest from reducing the life insurance benefits. I agree

with Defendants.

In *Chiles*, the Tenth Circuit considered a conflict between "a reservation of the right to change or discontinue a plan, appearing in the same document as a promise of interminable benefits to qualifying participants." *Chiles*, 95 F.3d at 1511. In that case, the plaintiffs were disabled employees who were receiving long-term disability ("LTD") benefits. *Id.* at 1508. Under the initial LTD plan, the employer paid all of the plaintiffs' medical, dental, and health insurance premiums. *Id.* However, after the sale of the company, the employer altered the LTD plan such that the plaintiffs were required to pay part of their health insurance premiums. *Id.* at 1509. The reservation of rights clause in the SPD stated that the new employer "expects to continue the [LTD] Plan indefinitely, but must reserve the right to change or discontinue if it becomes necessary. This would be done only after careful consideration." *Id.* The clause also contained the following proviso: "[i]f the Long-Term Disability Plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claim for such benefits will continue as long as you remain totally disabled as defined by the plan" (the "Termination Proviso"). *Id.*

Plaintiffs brought suit arguing that the SPD vested their rights in full payment of health care premiums during disability because it stated that the employer would continue to pay health care premiums as long as the employee remained disabled. *Chiles*, 95 F.3d at 1508–09. The Tenth Circuit disagreed and held that the reservation of rights clause controlled over the promise to pay all health premiums and, therefore, the employer could alter the plan. *Id.* at 1512. The Tenth Circuit declined to choose

between a bright line rule "finding a general reservation of rights clause unambiguously controlling any promise located in another part of an ERISA document and an approach finding ambiguity unless the plan document spells out exactly whose benefits may be unilaterally altered." *Id.* However, the Tenth Circuit did find that the employer had retained the right to alter the LTD benefits for all plan participants, including those who were already disabled at the time of the change. *Id.* The court noted three things that informed its decision. First, the court looked to the "interpretive maxim of *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of another." *Id.* Because the reservation of rights clause included the Termination Proviso limiting the employers ability to terminate the plan for currently disabled plan participants, the court inferred that "the right to make other changes to disabled participants' benefits was reserved." *Id.* Second, the court found support in the fact that the plan included a statement that all plan participants, including disabled employees, were bound by amendments to the plan. *Chiles*, 95 F.3d at 1512–13. Not only did this language show that the plan participants agreed to be bound by amendments but it also allowed an inference that the employer retained the right to make amendments. *See id.* Third, the court noted that the plaintiffs' reading of the plan would render the Termination Proviso superfluous—"under plaintiffs' interpretation, [the employer] may not alter the benefits of disabled participants under any condition, regardless of whether the plan terminates," a right which was expressly reserved in the Termination Proviso. *Id.* at 1513.

Although one might argue that facially inconsistent provisions create ambiguity,[9] the circumstances of this case are essentially the same as *Chiles*. First, the Reservation of Rights Clause includes a proviso that no amendment to the Plan "shall reduce the benefits of any Participant with respect to a loss incurred prior to the date such amendment is adopted" ("Prior Loss Proviso"). Under the maxim of *expressio unius est exclusio alterius*, because the Reservation of Rights Clause included a particular limitation on Qwest's ability to reduce benefits, it follows that Qwest's ability to reduce benefits under other circumstances is retained and reserved. Second, like *Chiles*, the 1998 Plan Documents include language that binds all participants to the Plan and any amendment to the Plan. The 1998 Plan Documents define "participant" to include "Eligible Retirees" and state that "[b]y becoming a Participant, each . . . Eligible Retiree . . . shall for all purposes be deemed conclusively to have assented to the provisions of the Plan and all amendments thereto." Finally, if I were to accept Plaintiffs' reading of the 1998 Plan Documents, the Prior Loss Proviso would be rendered superfluous. Indeed, under Plaintiffs' reading of the Plan, Qwest may not reduce life insurance benefits under any circumstances, regardless of whether the amendment reducing such benefits is adopted before or after the participant incurs a loss—the subject of the Prior Loss Proviso. Therefore, the issues presented are virtually identical to those in *Chiles*, which found that, as a matter of law, the employer

---

[9] *See Jensen v. Sipco, Inc.*, 38 F.3d 945, 950 (8th Cir. 1994). One could argue that any ambiguity could have been eliminated by adding conditional language to claimed vesting provisions such as "Except as provided in [Section reserving right to amend]" and that the failure to do so means the plan is at least ambiguous.

had retained the right to amend the LTD plan. *See id.* at 1511 ("In interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law.").

Plaintiffs articulate three arguments for why *Chiles* is not dispositive of their claim. First, they argue simply that the 1998 Plan Documents "unambiguously forbid Qwest from reducing such benefits below the stated minimums." (Resp. at 10.) In making this argument, however, Plaintiffs ignore the Reservation of Rights Clause in its entirety and focus only on the Benefits Clause. But, as Plaintiffs acknowledge, I must examine the Plan documents "as a whole" and, therefore, cannot ignore the Reservation of Rights Clause. *Chiles*, 95 F.3d at 1511. Furthermore, the relevant question is whether the "reservation of rights clause itself, read in tandem with" the Benefits Clause, is ambiguous, not whether the Benefits Clause itself is ambiguous. *Id.* at 1511–12.

Next, Plaintiffs argue that the Reservation of Rights Clause contains two limitations on Qwest's ability to amend life insurance benefits, not just one. Plaintiffs contend that Qwest's reservation of the right to amend the Plan is subject to both the Prior Loss Proviso and the Minimum Benefit Promise. I disagree. The Prior Loss Proviso is an express limitation on the Reservation of Rights Clause while the Minimum Benefit Promise is *subject to* the Reservation of Rights Clause. This distinction is apparent from the placement of the two clauses—the Prior Loss Proviso is expressly stated in the Reservation of Rights Clause while the Minimum Benefit Promise is contained in the Benefits Clause, an entirely separate section of the Plan.

Finally, Plaintiffs argue that a reading that Qwest retained the right to reduce benefits would render the Minimum Benefit Promise superfluous. Again, I disagree. Until Qwest amended the Plan to set a specific benefit amount, the Minimum Benefit Promise determined the amount of life insurance benefits an Eligible Retiree would receive after the reduction phase. For example, prior to the Plan Amendment, an Eligible Retiree was subject to benefit reductions after turning 66 but only to the extent that his benefits remained above the stated minimums. Therefore, I conclude that, as a matter of law, the Plan unambiguously reserves Qwest's right to amend the Plan including reducing the amount of life insurance benefits for retired employees. Accordingly, Plaintiffs have failed to state claim upon which relief can be granted for their contractual bar claim because they have failed to plead sufficient facts to establish by clear and express language that the welfare benefit rights were vested and not subject to change by the unambiguous terms of t he 1998 Plan Documents.

2. <u>Equitable Estoppel</u>

Plaintiffs also make a claim for relief under the doctrine of equitable estoppel. Plaintiffs allege that plan participants detrimentally relied on the Minimum Benefit Promise in the 1998 Plan Documents and the corresponding articulation of the promise in the SPDs and, therefore, Defendants are estopped from reducing the amount of benefits. In their Motion to Dismiss, Defendants argue that Plaintiffs' claim for equitable estoppel also fails because the Plan "unambiguously authorizes Qwest to reduce or eliminate the very benefits that Plaintiffs claims Qwest is equitably estopped from reducing." (Mtn. To Dismiss at 24.) Plaintiffs respond that they have asserted an

equitable estoppel claim because Qwest has "interpreted and explained" the 1998 Plan Documents in "formal notices sent out by Qwest."  (Resp. at 20.)

The Tenth Circuit has not expressly recognized an equitable estoppel claim in the ERISA context.  *Callery v. U.S. Life Ins. Co. in City of N.Y.*, 392 F.3d 401, 407 (10th Cir. 2004) ("Although other circuits have recognized equitable estoppel in limited circumstances in the context of ERISA, the Tenth Circuit has not done so." (citing *Miller v. Coastal Corp.*, 978 F.2d 622, 625 (10th Cir. 1992))); *Miller*, 978 F.2d at 625 ("As we indicated in *Straub[ v. W. Union Tel. Co.*, 851 F.2d 1262, 1265–65 (10th Cir. 1988)], we will not import notions of promissory estoppel into ERISA. . . .  We hold that there is no liability under ERISA for purported informal written modifications to an employee benefit plan."); *Cannon v. Group Health Serv. Of Okla., Inc.*, 77 F.3d 1270, 1277 (10th Cir. 1996) ("[The Tenth Circuit] has neither adopted nor rejected an equitable estoppel rule in the ERISA context.").  Generally, "ERISA's express requirement that the written terms of a benefit plan shall govern forecloses" a promissory estoppel claim.  *Averhart v. US West Mgmt. Pension Plan*, 46 F.3d 1480, 1485  (10th Cir. 1994).  "Where the written language of the plan is clear . . . any representation that is contrary to [the written] language [of an ERISA plan] can be viewed only as purported modification of the plan and, hence, preempted by ERISA."  *Id.* (alteration in original) (quoting *Peckham v. Gem State Mut. Of Utah*, 964 F.2d 1043, 1050 n.13 (10th Cir. 1992)).  The Tenth Circuit, however, has noted that estoppel may be a cognizable claim "where 'the terms of the plan are ambiguous' and 'the employer['s] communications constituted an interpretation of that ambiguity.'"  *Id.* at 1485–86 (noting that other courts have

recognized estoppel claims under these circumstances but failing to reach the issue). Generally, estoppel is only appropriate under "limited, extraordinary circumstances" such as in "egregious" cases when there are "lies, fraud, or an intent to deceive." *Miller*, 978 F.2d at 625; *Callery*, 392 F.3d at 407.

In this case, I have already held that the terms of the Plan are unambiguous as a matter of law; therefore, an estoppel claim is not cognizable. *See Averhart*, 46 F.3d 1485–86 (declining to expressly recognize an estoppel claim in the ERISA context but noting that one may be cognizable when the terms of the plan are ambiguous and the employer's actions constitute "an interpretation of that ambiguity"). Furthermore, Plaintiffs have not identified any "lies, fraud, or an intent to deceive" to demonstrate the "limited, extraordinary circumstances" necessary to support an estoppel claim. *Miller*, 978 F.2d at 625; *Callery*, 392 F.3d at 407. Plaintiffs do not address these deficiencies in their response, rather they simply argue that they relied upon the SPDs and confirmation letters stating the minimum benefit amounts. A mere claim of reliance, however, is insufficient on which to base a claim for equitable estoppel in the ERISA context. *See Miller*, 978 F.2d at 625; *Callery*, 392 F.3d at 407. Therefore, even if the Tenth Circuit recognized an equitable estoppel claim in the ERISA context, Plaintiffs have failed to state a claim upon which relief may be granted.

Plaintiffs also appear to argue that they are entitled to estoppel based on confirmation letters sent to retirees who retired prior to 1991. The confirmation statements sent out to pre-1991 retirees contained the following language: "The Company intends to continue these Plans indefinitely; however, it reserves the right to

amend, suspend, or discontinue them at any time, except for those who retired before 1991 and where prohibited by collective bargaining agreements." Plaintiffs argue that the plaintiffs who retired prior to 1991 relied on this language and, therefore, Defendants should be estopped from reducing life insurance benefits for these retirees. Defendants argue that they are not estopped from reducing benefits because the confirmation statements also included the following provision: "This worksheet contains only a general description of Company-sponsored benefit plans. The exact details of these plans are included in the legal plan documents that govern them. If there's a discrepancy between this worksheet and the plan documents, the plan documents will govern." Defendants contend that this provision, in combination with the Reservation of Rights Clause in the 1998 Plan Documents, authorizes them to reduce benefits for all Eligible Retirees regardless of when the retiree retired. I agree with Defendants.

To assert an estoppel claim under ERISA, if one is recognized in the Tenth Circuit, Plaintiffs must allege that there was an ambiguity in the Plan documents and the confirmation statement interpreted that ambiguity, *Averhart*, 46 F.3d 1485–86, or that there were "lies, fraud, or intent to deceive" in Qwest's actions. *Miller*, 978 F.2d at 625; *Callery*, 392 F.3d at 407. Plaintiffs have not alleged facts supporting either of these two circumstances. Moreover, I have already held that the 1998 Plan Documents' Reservation of Rights Clause is unambiguous in reserving Qwest's authority to alter or amend Plan benefits at any time for all Plan participants. Therefore, the confirmation statements cannot be said to interpret an ambiguity pertaining to Qwest's authority to amend Plan benefits. Additionally, the inclusion of an

express statement that the Plan documents control over the confirmation statement, appearing directly above the pre-1991 retiree limitation negates any claim of Qwest's intent to deceive. Therefore, I conclude that Plaintiffs have failed to state a claim upon which relief may be granted.

Finally, Plaintiffs argue that their equitable estoppel claim is based on "the doctrine of reasonable expectations." *See Salterelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 386–87 (9th Cir. 1994) ("We hereby adopt the doctrine of reasonable expectations as a principle of the uniform federal common law informing interpretation of ERISA-governed insurance contracts."). The doctrine is "a state law common law doctrine whereby courts will interpret policy language liberally to protect the reasonable expectations of insureds and intended beneficiaries, 'even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.' " *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1011 (10th Cir. 2000) (citing *Saltarelli*, 35 F.3d at 386). To avoid application of the doctrine, insurers "'must not only use clear and unequivocal language evidencing its intent to [limit liability], but it must also call such limiting conditions to the attention of the insured.'" *Id.* (citing *Leland v. Travelers Indem. Co.*, 712 P.2d 1060, 1064 (Colo. Ct. App. 1985)). The Tenth Circuit holds that this doctrine does not apply when the terms of the contract are unambiguous. *Id.* Indeed, "[w]here the insuring clause or exclusionary provision is conspicuous, clear, and unequivocal," the Tenth Circuit has concluded that "the application of the common law doctrine of reasonable expectation is improper." *Id.* (citations omitted). Given my determination that the terms of the 1998

Plan Documents are unambiguous, Plaintiffs have not stated a claim upon which relief can be granted for their claims based on the doctrine of reasonable expectations. Given this ruling, and as the parties acknowledge in their Stipulated Motion Regarding Briefing (Docket No. 22), it is unclear how this matter should best proceed, particularly with regard to Plaintiff's Amended Motion to Certify the Class (Docket No. 21).

Accordingly, it is ordered:

1. Defendants' Motion to Dismiss (Docket No. 16) is granted.
2. Plaintiffs' claims asserting that Defendants are contractually barred or equitably estopped from reducing the life insurance benefit for either pre- or post-1991 retirees are dismissed with prejudice. Plaintiffs' claim asserting a right under the doctrine of reasonable expectations is dismissed with prejudice.
3. All other claims remain pending.
4. Plaintiffs' original Motion to Certify the Class (Docket No. 11) is denied as moot given Plaintiffs' Amended Motion to Certify the Class (Docket No. 21).
5. The parties shall schedule a status conference on or before March 14, 2008.

DATED at Denver, Colorado, on February 27, 2008.

BY THE COURT:

s/ Walker D. Miller
United States District Judge