IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 07-cv-00644-WDM-KLM

EDWARD J. KERBER, *et al.*,

      Plaintiffs,

v.

QWEST GROUP LIFE INSURANCE PLAN, *et al.*,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Miller, J.

      This matter is before me on Defendants' Motion for Summary Judgment on

Plaintiffs' Second Claim for Relief (Docket No. 107), filed September 12, 2008, and

Defendants' Motion for Summary Judgment on Plaintiffs' Sixth, Seventh, and Eighth

Claims for Relief (Docket No. 108), filed September 15, 2008.  Despite Plaintiffs'

request, after a review of the pleadings and the parties' written arguments, I conclude

oral argument is not required.  For the reasons that follow, Defendants' motion on

Plaintiffs' Second Claim is granted and Defendants' motion on Plaintiffs' Sixth, Seventh,

and Eighth Claims is granted in part and denied in part as moot.

<u>Background</u>

      This case centers around the life insurance plan (the "Plan" or "Life Plan")

Defendant Qwest Communications International, Inc. ("Qwest") provides to its

employees ("Plan Participants").[1]  Initially, the Plan provided that the life insurance benefit amount (the "Life Benefit") for retirees would be that in effect at retirement until a certain age, generally 66, and then it would be reduced over a number of years pursuant to a formula to 50 percent of the benefit amount in effect at retirement.

At various times prior to the Plaintiffs' retirements and prior to any changes in the Life Benefit, Qwest sent Summary Plan Descriptions ("SPDs") and other plan documents to Plan Participants which all stated that Qwest reserved the right to amend the Plan.  (*See* Stmt of Undisputed Material Facts in Defs.' Mtn., Docket No. 107 ¶ 4.)[2] The SPD issued in June 1987, which was in effect at the time Sharon Strizich[3] and Plaintiffs Kerber and Phelps retired in February 1990, set forth the reduction formula for the Life Benefit and provided that "[t]he Company intends to continue the Group Life Insurance Benefit Program but reserves the right to terminate or amend it at any time, subject to applicable limitations in the law or any applicable collective bargaining

---

[1]  The Plan was previously maintained by U.S. West Communications, Inc. ("US West").  In July 2000, US West merged with Qwest with Qwest as the surviving company.  In this Order I will refer to Qwest and/or its predecessors collectively as "Qwest".

[2]  Although Plaintiffs purport to dispute that various SPDs were issued that contained the reservation of rights clauses (*see* Resp., Docket No. 113 ¶ 4 (disputing Defendants' ¶ 4)), Plaintiffs do not provide any "specific reference to material in the record supporting the denial" as required by Section 6.4 of my PreTrial and Trial Procedures.  Rather, Plaintiffs allege that SPDs were not issued to retirees upon their retirement, an issue not contested by Qwest and, as discussed *infra* in this Order, not at issue now.

[3]  Sharon Strizich's husband is a plaintiff in this action as Sharon's beneficiary under the Life Plan.  Sharon was a pre-1991 retiree who retired on February 28, 1990 along with Plaintiffs Kerber and Phelps.  She died on March 20, 2007 and Plaintiff Strizich, her named beneficiary, was paid $10,000 under the reduced Life Plan.

agreements." (Docket No. 107-13 at 5.)  Additionally, Qwest continued to send periodic SPDs throughout the relevant time frame of this case, including after the Life Plan was altered to reduce the Life Benefit to a flat $10,000.

In December 1989 Qwest offered an early retirement option to some of its management employees (the "5+5 Option").  Qwest sent a packet of material detailing the 5+5 Option to eligible retirees including a two-page document titled "US West Insurance Plans" (the "Insurance Plan Description").  This document summarized the Life Plan and other insurance benefits that the prospective retirees would be eligible for if they chose to participate in the 5+5 Option.  At the top of the page, the Insurance Plan Description stated: "While the plans listed below are the plans currently provided to eligible employees upon retirement, the Company reserves the right to amend or terminate any or all provisions in the future for any reason." (Docket No. 107-30 at 24.) The Insurance Plan Description also set forth the formula for determining the Life Benefit.

In addition to providing the written material on the 5+5 Option, Qwest made available a "Video Conference", which was designed to answer questions about the 5+5 Option.  In that Video Conference, the following colloquy took place:

> **Moderator:** . . . [T]here is a statement in some of the paperwork that people received in their packets that's raised some questions, and that is the statement that says the company reserves the right to change benefits. There are some people worried about that.  Can you speak to that statement?
>
> **Human Resources Director Charlie Kamen:**  Sure. That's a typical reservation of rights statement that appears in virtually every employee benefit plan, not just US West benefit plans, but all companies' benefit plans. It is not intended to be divisive, it is not intended to be a below the board type of thing.  What it is intended to do though, is it's intended to give the

company the ability to modify the plans as circumstances and conditions change in the future.  It's really intended to make the plans more meaningful and more affordable not only for the employee but for the company.

(*See* Defs.' Mtn, Docket No. 107 ¶ 8; Pls.'s Resp., Docket No. 113 ¶ 8.)

On March 26, 1990, Qwest sent confirmation letters to all employees who had opted to participate in the 5+5 Option (the "5+5 Retirees").  The letters essentially summarized the logistics of receiving the pension checks and some of the other benefits that the 5+5 Retirees would receive.  The letter sent to 5+5 Retirees who opted to receive a monthly pension check stated "[t]he death benefit is paid in addition to benefits paid under the Group Life Insurance Program."  (Docket No. 107-38 at 2.)  The letter sent to 5+5 Retirees who opted to receive a lump sum pension check stated "[y]ou are entitled to the benefits paid under the Group Life Insurance Program."  (Docket No. 107-39 at 2.)

In September 1997, an alternative minimum benefit was added to the Plan so that the Life Benefit would reduce according to the formula but in no event below the alternative minimum benefit.  The governing documents for the Plan incorporating the change were issued in June 1998 ("1998 Plan Documents").  These documents contain a clause relating to the amendment of the Plan ("Reservation of Rights Clause").  It states as follows:

> Amendment.   Except to the extent limited by an applicable collective bargaining agreement, the Company reserves the right, in its sole discretion, to amend the Plan at any time, in any manner, including, without limitation, the right to amend the Plan to reduce, change, eliminate, or modify the type or amount of Benefits provided to any class of Participants.  Moreover, unless otherwise explicitly provided in a Contract, no amendment shall be made to the Plan without the consent of the Company.   Any such amendment of the Plan shall be effective on such date as the Plan Sponsor may determine; provided, however, that no amendment shall reduce the

4

benefits of any Participant with respect to a loss incurred prior to the date such amendment is adopted.[4]

Subsequently, in October 2005, the Qwest Plan Design Committee ("PDC") met and issued "Minutes and Resolutions, October 14, 2005" (the "October 2005 Resolutions"), which set forth the "current situation" regarding the Life Benefit and a "recommendation" that the Life Benefit be reduced to a fixed $10,000 benefit for all post-1990 occupational retirees.  The October 2005 Resolutions concluded with the statement "the Qwest Group Life Insurance Plan be and hereby is amended and restated to incorporate the design changes approved."  Although the these resolutions contemplated a "final form", none was ever completed.  Qwest did, however, send a Statement of Material Modification ("SMM") to the plan participants detailing the change, include the change in a 2006 Occupational Benefit Program Guide, notify its insurer, Prudential Insurance Company of America ("Prudential") of the change, and begin administering the Plan with the reduced Life Benefit for post-1990 occupational retirees on January 1, 2006.  On December 13, 2006, the PDC adopted "Amendment 2006-1" which essentially formalized the reduced benefit change for post-1990 occupational retirees.

After a September 14, 2006 meeting, the PDC issued "Minutes and Resolutions September 14, 2006" (the "September 2006 Resolutions"), which detailed the "current situation" and recommended that, *inter alia*, effective January 1, 2007 the Life Benefit be reduced to a flat $10,000 for all pre-1991 retirees.  The September 2006 Resolutions

---

[4] As in other Orders, I will continue to refer to the last sentence in the Reservation of Rights Clause as the "Prior Loss Proviso."

concluded with the statements:

> RESOLVED, that the Plan Design Committee approves of the proposed plan design recommendations for the 2007 plan year.

> RESOLVED, that the Qwest Group Life Insurance Plan be and hereby is amended to incorporate the design changes approved.

> . . .

> FURTHER RESOLVED, that that [sic] that Executive Vice President and Chief Human Resources Officer is authorized to approve and execute the final form of such Plan amendment and restatement.

(Defs.' Ex. A-12, Docket No. 108-7 at 2–3.)  In October 2006, Qwest notified all Plan

Participants of the change by sending (1) an SMM detailing the reduction in the Life

Benefit for all pre-1991 retirees; (2) a "2007 Pre-1991 Benefit Program Guide" (the

"2007 Pre-1991 Guide") which provided that "Effective Jan. 1, 2007, the Basic Life

Insurance benefit for eligible Pre-1991 Retirees will be reduced to a flat ten thousand

dollar ($10,000) benefit payable upon the death of the eligible retiree" (Defs.' Ex. A-23,

Docket No. 108-18 at 3); and (3) Benefit Enrollment Statements to each eligible retiree

which stated that the available basic life insurance benefit option was a "FLAT $10,000"

for the monthly cost of "$0.00" (Defs.' Ex. A-25, Docket No. 108-20 at 3).  Qwest notified

Prudential of the change in late 2006 and Qwest and Prudential agreed that the policy

would be amended to reflect the change.  Prudential began administering the plan with

the reduced Life Benefit on January 1, 2007.  On February 7, 2007, Qwest and

Prudential entered into a written amendment to the Restated Group Contract, the

governing contract with respect to Qwest's Life Plan, to effect the reduction in Life

Benefit.  Qwest did not sign the amendment.

On June 13, 2007, the PDC executed a document titled "Resolutions of the

6

Qwest Plan Design Committee: Qwest Group Life Insurance Plan Regarding

Amendment 2007-1" (the "June 2007 Resolutions").  The June 2007 Resolutions stated:

> the Plan Design Committee previously amended the Life Plan: (a) on October 14, 2005 to, *inter alia*, change the Basic Life Coverage for Post-1990 Occupational Retirees to reduce such benefit to a fixed $10,000 benefit effective January 1, 2006, and (b) on September 14, 2006 to, *inter alia*, change the Basic Life Coverage for all Pre-1991 Retirees, ERO-1992 Retirees, and Management Post-1990 Retirees to reduce such benefit to a fixed $10,000 benefit effective January 1, 2007 (collectively the "Prior Life Plan Amendments") . . .

(Defs.' Ex. A-14, Docket No. 108-9 at 2.)  The document went on to formally alter the

terms of the Plan to reflect the reduced Life Benefit.  It concluded with the statement

"RESOLVED, that the Life Plan be and hereby is amended to further document the Prior

Life Plan Amendments and to incorporate the amendments and modifications outlined

above."  *Id.* at 4.

Over the years, Qwest provided "Confirmation Statements" to Plan Participants.

The Confirmation Statements for the years 2001 through 2004 stated that "[t]he

Company intends to continue these plans indefinitely; however, it reserves the right to

amend, suspend, or discontinue them at any time, except for those who retired before

1991 and where prohibited by a collective bargaining agreement."  Immediately above

this language was the statement that "[t]his Statement contains only a general

description of Company-sponsored benefit plans. The exact details of these plans are

included in the legal plan documents that govern them.  If there's a discrepancy

between this worksheet and the plan documents, the plan documents will govern."

In March 2007, Plaintiffs filed this lawsuit seeking for themselves and "all other

Plan Participants and Beneficiaries . . . a panoply of declaratory, temporary, preliminary

and permanent injunctive and other equitable relief." (Am. Compl., Docket No. 10 ¶ 6.) On February 27, 2008, I dismissed Plaintiffs' claims that Defendants were contractually barred and equitably estopped from reducing the minimum life insurance benefit. (*See* Order dated February 27, 008, Docket No. 47.) I concluded that "as a matter of law, the Plan unambiguously reserves Qwest's right to amend the Plan including reducing the amount of life insurance benefits for retired employees." *Id.* at 12. Plaintiffs filed a Second Amended Complaint on April 3, 2008 (Docket No. 69.) On March 25, 2009, I granted Defendants' motion to dismiss with respect to Claims 1 and 7 but denied it with respect to Claim 2. (*See* Docket No. 151.) On March 31, 2009, I granted summary judgment to Defendants on Claims 3, 4, and 5. (*See* Docket No. 152.)

Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *accord Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("Under Fed. R. Civ. P. 56(c), summary judgment is only appropriate if the pleadings and admissible evidence produced during discovery, together with any affidavits, show that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "When applying this standard, [the court] view[s] the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (citing *Byers v. City of*

8

*Albuquerque*, 150 F.3d 1271, 174 (10th Cir. 1998)).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.* (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). Indeed, the plaintiff must set forth specific facts "that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (D. Colo. 1998) (citing Fed. R. Civ. P. 56(e)). A mere scintilla of evidence is not sufficient to create a genuine issue of material fact and survive summary judgment, *Simms*, 165 F.3d at 1326 (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)), nor are unsupported conclusory allegations, *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (citing *L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000)). When the opposing party fails to "set out specific facts showing a genuine issue for trial . . . summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). Indeed, a "nonmovant acts, or fails to act, at its peril." *Adler*, 144 F.3d at 672.

<u>Discussion</u>

At issue in Defendants' motions for summary judgment addressed in this Order

are Plaintiffs' Claims 2, 6, and 8.[5]  I shall address the arguments with respect to each

claim separately.

1.      Claim 2

Claim 2 alleges breach of fiduciary duty for material misrepresentations under 29

U.S.C. § 1132(a)(1)[6] and is brought on behalf of Plaintiffs Kerber and Phelps[7] and the

"proposed class of Eligible Retirees to whom Qwest sent the Confirmation Notices

concerning the rights of pre-1991 retirees."  (2d Am. Compl., Docket No. 69 ¶ 88.)

Plaintiffs allege that Defendants, through various communications sent to Pre-1991

Retirees, falsely represented to these retirees that the Life Benefit as it existed at the

time of their retirement would be maintained and never reduced.  (SAC ¶¶ 82–87.)

Accordingly, they seek "appropriate equitable relief."  *Id.*  Defendants move for summary

judgment because (1) Qwest made no actionable misrepresentations or omissions; (2)

no plaintiff reasonably relied on the alleged misrepresentations; and (3) the relief sought

in Claim 2 is not available to Plaintiffs.

---

[5]  Defendants' Motion for Summary Judgment on Plaintiffs' Sixth, Seventh, and Eighth Claims (Docket No. 108) also addresses Claim 7.  Claim 7, however, was previously dismissed in my Order on Motion to Dismiss (Docket No. 151), dated March 25, 2009.  Accordingly, the arguments pertaining to Claim 7 are now moot and will not be addressed in this Order.

[6]  29 U.S.C. § 1132(a)(1) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

[7]  I note that it appears that Sharon Strizich's classification was essentially the same as Plaintiffs Kerber and Phelps in that she retired in February 1990 as a 5+5 Retiree.  However, Claim 2 is not brought on behalf of her or her husband, Plaintiff Strizich.

"'[A] fiduciary has a legal duty to disclose to the beneficiary only those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection.'"  *Horn v. Cendant Operations, Inc.*, 69 Fed. Appx. 421, 427 (10th Cir. July 3, 2003) (unpublished)[8] (quoting  *Glaziers & Glassworkers Union Local No.252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1182 (3d Cir. 1996)). Although the Tenth Circuit has not articulated a test for analyzing a breach of fiduciary duty claim for misrepresentations, the Third Circuit adheres to a clear test which has been used in this district:

> [T]o make out a breach of fiduciary duty claim [under ERISA], a plaintiff must establish each of the following elements: (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.

*Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir. 2001); *see Owen v. Regence Bluecross Blueshield of Utah*, 388 F.Supp.2d 1318, 1333 (D. Utah 2005) (applying the test from *Daniels*) (citing *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 384 (3d Cir. 2003) (adhering to the *Daniels* test)).  "A fiduciary's misrepresentation or failure to disclose is material 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed . . . decision.'"  *Horn*, 69 Fed. Appx. At 427 (quoting *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1015 (3d Cir. 1997) (alteration in original).

Before determining whether Defendants are entitled to summary judgment on

---

[8] Although the Tenth Circuit does not allow citation to unpublished opinions for precedential value, unpublished opinions may be cited for persuasive value. 10th Cir. R. 32.1.

Plaintiffs' Second Claim, there are three preliminary matters that must be addressed.

First, Plaintiffs argue in their response that Defendants' motion oversimplifies Claim 2 by

focusing on only the paragraphs related directly to that claim, *i.e.*, ¶¶ 82–88, and not on

the preceding paragraphs incorporated into the claim by reference, *i.e.*, ¶¶ 1-80.

Plaintiffs allege that Claim 2 seeks relief from "a series of breaches of ERISA fiduciary

duties." (Resp., Docket No. 113 at 8.)  To illustrate their point, Plaintiffs set forth

allegations that they claim are breaches of fiduciary duty as alleged under Claim 2, but

which actually form the basis for Claim 2 as well as Claims 5, 6, and 7.  Review of Claim

2 reveals that the wrong alleged in the claim is a breach of fiduciary duty in the form of

material misrepresentations.  (*See* Am. Compl., Docket No. 69 ¶¶ 82-88).  This fact is

not changed by Claim 2's express incorporation of the preceding paragraphs, even

though these preceding paragraphs may include allegations that are sufficient to sustain

other claims based on other alleged wrongs.  Therefore, the parties' arguments are only

relevant here to the extent they relate to material misrepresentations.

Second, I note that I already determined that Claim 2 is not precluded by my

previous ruling that Plaintiffs failed to adequately state a claim for equitable estoppel.

(*See* Order on Motion to Dismiss, Docket No. 151 at 11–12.)  In the previous Order, I

noted that "unlike an ERISA equitable estoppel claim, a breach of fiduciary duty claim

does not require that the misrepresentation be intentional."  *Id.* (citing *Daniels*, 263 F.3d

at 73).  Therefore, I concluded that my determination in the February 27, 2008

Amended Order on Motion to Dismiss (Docket No. 47) that Plaintiffs had failed to

demonstrate "lies, fraud, or an intent to deceive" did not affect Claim 2.  *Id.* at 12.

Third, Plaintiffs' response to Defendants' motion for summary judgment

continually refers to Qwest's failure to provide an SPD upon retirement.  Plaintiffs, however, provide no legal basis demonstrating that Qwest was required to provide a valid SPD at retirement.  Therefore, I conclude that Qwest's failure to provide such SPD to any plaintiff upon their retirement is not relevant to the issues presented here, especially in the context of Claim 2, which is based solely on material misrepresentations.

With respect to the motion for summary judgment on Claim 2, I conclude that summary judgment is appropriate as Plaintiffs have failed to demonstrate that there remains an issue of fact whether any plaintiff reasonably relied on an actionable material misrepresentation.  Plaintiffs contend that they reasonably relied on material misrepresentations that the Life Benefit would not be reduced made by Qwest in various forms including the 1987 SPD, the Insurance Plan Description, a presentation by the Director of Benefits, the Video Conference on the 5+5 Option, the March 1990 confirmation letter, and Confirmation Statements sent annually in 2001 through 2004. Review of each of these statements, however, reveals that either the statement was not a misrepresentation, the misrepresentation was not material, or Plaintiffs did not rely on the statement.

Plaintiffs argue that the reservation of rights clause in the 1987 SPD stating that "[t]he Company intends to continue the Group Life Insurance Benefit Program but reserves the right to terminate or amend it at any time, subject to applicable limitations in the law or any applicable collective bargaining agreements" (Docket No. 107-13 at 5) was ambiguous and, therefore, constituted a material misrepresentation.  However, the determination of whether the reservation of rights clause was ambiguous is not the

13

central issue in Plaintiffs' breach of fiduciary duty claim.[9]  *See id.* at 91 (determining that when there is an ambiguity in the reservation of rights clause, the trier of fact must determine whether the plan vested benefit rights); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir. 1996) (determining that an unambiguous reservation of rights clause was dispositive of whether the plan promised vested benefits); *Daniels*, 263 F.3d at 73 (setting forth the elements of a misrepresentation claim).  Rather, the central issue is whether any document constituted a material misrepresentation.  *See Daniels*, 263 F.3d at 73.

I am mindful, however, that ambiguity in a reservation of rights clause may inform this determination.  Therefore, I must determine, as a matter of law, whether the reservation of rights clauses were ambiguous.  *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 244 (2d Cir. 2007) ("Whether ERISA plan language 'is ambiguous is a question of law that is resolved by reference to the contract alone.'" (quoting *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen.*, 37 F.3d 55, 59 (2d Cir. 1994))); *Balestracci v. NSTAR Elec. & Gas Corp.*, 449 F.3d 224, 230 (3d Cir. 2006) ("The question of whether an ERISA plan term is ambiguous is generally a question of law for the judge." (citing *Allen v. Adage, Inc.*, 967 F.2d 695, 698 (1st Cir. 1992))); *see Elliott Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1108 n.11 (10th Cir. 2005) ("The

---

[9]  Furthermore, as any alleged ambiguity is not the central issue in a material misrepresentation claim, the doctrine of *contra proferentem*, is not applicable.  The doctrine "requires [a court] to construe all ambiguities against the drafter."  *Miller v. Monumental Life Ins. Co.*, 502 f.3d 1245, 1253 (10th Cir. 2007).  Here, I am not charged with interpreting the terms of a contract or construing the language of the Plan in any direction but rather must determine whether any statements by Qwest misrepresented the actual terms of the contract.

determination of whether a contract is ambiguous is a question of law." (citation

omitted)).  As support for their contention that the 1987 SPD's reservation of rights

clause was ambiguous, Plaintiffs cite to *Alexander v. Primerica Holdings, Inc.*, 967 F.2d

90, 92–93 (3d Cir. 1992), which determined that a reservation of rights clause stating

that "[t]he Company expects to continue this Plan indefinitely, but necessarily reserves

the right to amend, modify, or discontinue the Plan in the future in conformity with

applicable legislation" was ambiguous.  However, the specific characteristics of the

clause that the Third Circuit determined made it ambiguous are not included in the 1987

SPD's reservation of rights clause including "necessarily", "in conformity with applicable

legislation", and "indefinitely."  *Id.*  Therefore, *Alexander* does not support Plaintiffs'

contention that the 1987 SPD, or indeed any other Qwest reservation of rights clause,

was ambiguous.

Furthermore, the plain reading of Qwest's reservation of rights clauses

demonstrates that they were not, in fact, ambiguous.  Although the 1987 SPD included

a modifying clause, *i.e.*, "subject to applicable limitations in the law or any applicable

collective bargaining agreement", this did not serve to make the reservation of rights

clause ambiguous with respect to whether Qwest could reduce or eliminate the Life

Benefit.  Indeed, I find that the 1987 SPD clearly stated that Qwest maintained the right

to reduce or amend the benefits under the Plan, with the limitation that it could only do

so if the amendment or termination complied with applicable law and collective

bargaining agreements.  *See Crown Cork & Seal Co., Inc. v. Int'l Assoc. of Machinists &*

*Aerospace Workers*, 501 F.3d 912 (8th Cir. 2007) (concluding that a reservation of

rights clause that "[the company] hopes and expects to continue the Plan indefinitely,

15

but reserves the right to change or terminate it in the future, subject naturally, to any outstanding contractual agreements" was unambiguous).  The Insurance Plan Description was even more clear that Qwest retained the right to amend or terminate the plan at any time or in any way as it did not even include a modifying clause.  Finally, the Video Conference also clearly indicated that Qwest maintained the right to alter or terminate the Life Benefit.  Even if the Video Conference can be considered to have "downplayed" the importance of the reservation of rights clause, it clearly and unequivocally stated that Qwest retained the right to alter or terminate the Life Benefit.[10]

Given my determination that the clauses were not ambiguous, I cannot conclude that Qwest made any material misrepresentation as no document expresses or suggests an intent to continue the Life Plan with no reduction without also including an express reservation of rights clause.  With respect to the 1987 SPD,[11] although it set forth the formula for reducing the Life Benefit and stated "[t]hereafter, 50% of the Basic coverage . . . you had when you retired will be continued without further reduction—at no cost to you", it also included an express reservation of rights clause providing that

---

[10]   Although there were additional reservation or rights clauses in the Confirmation Statements, I need not determine whether these were unambiguous.  *See* discussion *infra*.

[11]  There is no dispute that no SPD issued after Plaintiffs Kerber and Phelps' retirements included any language indicating that Plaintiffs were entitled to the Life Benefit as it existed at the time they retired. (*See* Resp., Docket No. 113 ¶ 14 ("Plaintiffs . . . further state that the SPDs subsequently sent to retirees after they retired conflict with the clear language of the official notice confirming that Plaintiffs . . . and other 5+5 early retirement recipients were already 'entitled' to the benefits paid under the Group Life Insurance Program . . . ."); ¶ 25 ("[A]ll versions of SPDs issued after Plaintiffs retired fail to state that Pre-1991 Retirees 'are entitled to the benefits under the Group Life Insurance Plan.'").  Therefore, as the 1987 SPD was in effect at the time Plaintiffs Kerber and Phelps retired, it is the only SPD at issue in Claim 2.

Qwest reserved the right to terminate or amend the Life Plan at any time.  (*See* Docket No. 107-13 at 3, 5.)  I cannot conclude that the statement "without further reduction" made in the context of explaining the reduction formula misrepresented that the Life Plan would never be amended or terminated when there was an express and unambiguous reservation of rights clause in the same short document under the heading "Plan Continuance."  *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004) ("In law, the inclusion of reservation of rights clauses in an agreement accurately conveys that benefits may be altered or terminated.").[12]  Indeed, the phrase "without reduction" accurately described the Life Benefit at that time as the formula did not call for reduction below 50%.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) ("[W]e do not think that [Defendant's] accurate representations of its current program can reasonably be deemed misleading.").[13]

Likewise, I conclude that the Insurance Plan Description is not a misrepresentation.  It, too, contained an express reservation of rights clause that informed 5+5 Retirees of Qwest's retained right to reduce or terminate the Life Plan at any time for any reason.  *See Vallone*, 375 F.3d at 642.  There was no indication in the Life Benefit description that Qwest was guaranteeing that the Life Benefit would

_____

[12]  Plaintiffs argue that *Vallone* is inapposite because it did not address an employer who provided false statements about the plan while Plaintiffs here have asserted false statements were made by Qwest.  However, although Plaintiffs may have alleged that certain statements were false, I disagree as this order concludes.

[13]  Plaintiffs' attempt to distinguish *Sprague* is also unpersuasive.  Although *Sprague* does not address some of the specific circumstances present in this case such as the Video Conference, it did address the general issue at hand here, *i.e.*, whether the employer breached its fiduciary duties when it explained the benefit program to retirees. *See Sprague*, 133 F.3d at 405.

continue as stated without any possibility of reduction or termination.  Rather, as noted above, the first line of the document provided that Qwest reserved the right to amend the Life Plan at any time for any reason.  Therefore, the Insurance Plan Description was not a misrepresentation because it clearly stated Qwest's reservation of rights, while accurately explaining the benefit provided at that time.  *See Sprague*, 133 F.3d at 405.

It is similarly clear that the Video Conference contained no misrepresentation. The colloquy in question plainly states that Qwest reserves the right to amend the plan. Any "downplaying" of that fact is either not present or insufficient to constitute a material misrepresentation given the express acknowledgment of Qwest's reservation of rights. Indeed, Mr. Kamen clearly states that the reservation of rights clause is "intended to give the company the ability to modify the plans as circumstances and conditions change in the future."  Mr. Kamen's statements that the reservation of rights clause was standard for all employee benefit plans, that it was not intended to be "below the board", and that it was intended to make the plans "more meaningful and more affordable not only for the employee but for the company" cannot negate the clear statement that the clause was meant to reserve Qwest's right to amend the plan at its discretion.  *See Vallone*, 375 F.3d at 642.

Furthermore, it would be unreasonable and, even nonsensical, to hold that a company breaches its fiduciary duties by explaining the benefits it currently offers and, in the same document, expressly reserving the right to amend those benefits.  *See Sprague*, 133 F.3d at 405 (""While these explanations [of benefits] may state a company's current intentions with respect to the plan, they cannot be expected to foreclose the possibility that changing financial conditions will require a company to

18

modify welfare benefit plan provisions at some point in the future.'" (quoting *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 857 (4th Cir. 1994))).   Such a rule would make it virtually impossible for an employer to provide information on its benefit plans while still maintaining the ability to alter or terminate the benefits.  This result would, in effect, deny the employer the right to alter a plan.

I also conclude that the March 1990 confirmation letters sent to 5+5 Retirees Kerber and Phelps, the only two Plaintiffs who bring Claim 2 were not misrepresentations.  These letters did not state or even suggest that Plaintiffs would be entitled to life insurance benefits.  Rather, Kerber and Phelps, as 5+5 Retirees who opted to receive monthly pension checks received the letter stating only that "[t]he death benefit is paid in addition to benefits paid under the Group Life Insurance Plan."  (*See* Pls.' Resp., Docket No. 113 ¶ 112 (admitting that Kerber and Phelps received the letter for 5+5 Retirees opting to receive monthly pension checks, which included the quoted language).)  Therefore, as the material that Kerber and Phelps received did not include any indication that the Life Benefit would not be reduced or was vested for life, the March 1990 confirmation letters do not constitute misrepresentations.

With respect to the statements made by Mr. Bouchard to Plaintiff Phelps,[14] Plaintiffs have not demonstrated that the comments were material.  Plaintiffs have submitted an affidavit of John G. Shea, a former US West employee, indicating that a

---

[14]  Although it is unclear whether Plaintiffs' reference to a "presentation" in their response refers to Mr. Bouchard's comments to Plaintiff Phelps, because there is no elaboration or description of any "presentation", I will construe the argument as pertaining to Mr. Bouchard's comments to Plaintiff Phelps. If the reference to "presentation" pertains to something else, Plaintiffs' have provided insufficient information for me to address such argument here.

US West representative was instructed to assure 5+5 Option eligible employees that the

life insurance was guaranteed during the 5+5 workshops (Docket No. 113-5 ¶ 8)[15] and

an affidavit by Plaintiff Phelps attesting that Mr. Bouchard, the Senior Vice President of

Human Resources at US West and Chairman of the US West Employee Benefits

Committee, told him that he "would be guaranteed and become entitled to the promised

life insurance benefits" (Docket No. 113-3 ¶ 8).  Plaintiffs do not, however, adequately

address the case law holding that an employee cannot *reasonably* rely on oral

statements when he is in possession of contradictory written materials. *See, e.g.*, *Livick*

*v. The Gillette Co.*, 524 F.3d 24, 31 (1st Cir. 2008) (holding "a plan beneficiary might

reasonably rely on an informal statement interpreting an ambiguous plan provision; if

the provision is clear, however, an informal statement in conflict with it is in effect

purporting to modify the plan term, rendering any reliance on it inherently unreasonable"

with respect to an estoppel claim); *Frahm v. v. Equitable Life Assur. Soc'y of the United*

*States*, 137 F.3d 955, 961 (7th Cir. 1998) ("In federal law, a person cannot rely on an

oral statement, when he has in hand written materials disclosing the truth." (citing

*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir.

1985))); *Woods v. Nat'l Med. Care, Inc.*, 25 Fed. Appx. 767, 772 (10th Cir. Dec. 11,

2001) (unpublished) (holding that "any reliance on [oral representations] could not have

been reasonable given that they were clearly contradicted in writing" in addressing a

promissory estoppel claim).  Although these cases generally deal with ERISA estoppel

claims rather than breach of fiduciary duty claims, I conclude that the rule applies with

---

[15]  It does not appear that any Plaintiff relied on the "workshops" described by Mr. Shea.  Indeed, Plaintiffs do not reference any "workshops" in their response nor does it appear that any Plaintiff mentions a "workshop" in their affidavits.

equal force in misrepresentation claims.

To sustain a misrepresentation claim, a plaintiff must demonstrate that the misrepresentation is material, that is, it creates a "'substantial likelihood that it would mislead a *reasonable* employee in making an adequately informed'" decision. *Horn*, 69 Fed. Appx. At 427 (quoting *Jordan*, 116 F.3d at 1015) (emphasis added).  In this case, even if the presentation, the workshops, or Mr. Bouchard's comments misrepresented the permanency of the Life Benefit to Plaintiff Phelps, there is no dispute that Phelps had possession of both the 1987 SPD and the Insurance Plan Description, both of which included an express reservation of rights clause.  Therefore, given the clear case law indicating that it is not reasonable to rely on oral statements that contradict clear written statements, I cannot conclude that the oral statements here are material as Plaintiff Phelps was in possession of express written reservation of right clauses that were in effect at that time.

Plaintiffs argue that this line of cases does not apply here as the 5+5 Retirees were not provided an SPD upon their retirement.  As I noted above, however, Qwest is under no duty to provide an SPD upon retirement.  Plaintiffs also argue that the cases do not apply because the reservation of rights clauses in the 1987 SPD and the Insurance Plan Description are ambiguous.  As determined above, however, these reservation of rights clauses were not ambiguous.  Therefore, I conclude that the statements by Mr. Bouchard to Plaintiff Phelps cannot form the basis of Plaintiffs' misrepresentation claim because the statements were not material.

Plaintiffs also allege that the Confirmation Statements sent annually in 2001 through 2004 constitute material misrepresentations.  The 2001 to 2004 Confirmation

Statements state that "[t]he Company . . . reserves the right to amend, suspend, or discontinue [the Plan] at any time, except for those who retired before 1991."  Even assuming that these statements created a "substantial likelihood that it would mislead a reasonable employee in making an adequately informed . . . decision.'" *Horn*, 69 Fed. Appx. at 427 (quoting *Jordan*, 116 F.3d at 1015 (alteration in original)), Plaintiffs do not allege any detrimental reliance on these statements.[16]  Indeed, the reliance that Plaintiffs allege is that they agreed to participate in the 5+5 Option and declined to obtain alternative insurance at that time based on their belief that the Life Benefit was vested.  As the Confirmation Statements were issued more than a decade after Plaintiffs retired, Plaintiffs could not have relied on these documents when making their decision to participate in the 5+5 Option or whether to purchase additional insurance. Therefore, these Confirmation Statements cannot form the basis for Claim 2.  Thus, as I have determined that there remains no issue of fact as to whether Plaintiffs relied on material misrepresentations—either because there was no misrepresentation, the alleged misrepresentation was not material, or there was no reliance—summary judgment is appropriate for Defendants on Claim 2.

2.   Claim 6

In Claim 6, on behalf of Plaintiff Strizich and a putative class of similarly situated plan beneficiaries, Plaintiffs allege that the reduction of benefits for pre-1991 retirees violated the Prior Loss Proviso because it was made in the absence of a duly adopted

---

[16]  Plaintiffs' arguments that they need not demonstrate detrimental reliance are without merit.  As I determined in the March 25, 2009 Order, "[e]ven if a showing of actual harm is not necessary to maintain a general breach of fiduciary duty claim, detrimental reliance is an element of a misrepresentation claim, *see Daniels*, 263 F.3d at 73 . . . ."  (Docket No. 151 at 13.)

Plan amendment.  The arguments raised with respect to Claim 6 are equivalent to those raised with respect to Claim 5.  Therefore, the same reasoning I applied in the March 31, 2009 Order is applicable here.

The controlling legal authority was set forth in the March 31, 2009 Order as follows:

> In *Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 85 (1995), the Supreme Court addressed an amendment to a health benefit plan.  In determining that the reservation of rights clause was sufficient to set forth an amendment procedure, the Court noted that to amend a plan, the company would need to "'sufficiently manifest its intention' to amend." *Curtiss-Wright*, 514 U.S. at 80 (quoting Restatement (Second) of Trusts § 331, Comment c (1957) ("If the settlor reserves a power to modify but does not specify any method of modification, the power may be exercised by any method which sufficiently manifests his intention to modify the trust.")).[17]  In remanding the case, the Court stated that the question was whether Curtiss-Wright had complied with the amendment procedure, a determination of which would require "a fact-intensive inquiry, under applicable corporate law principles, into what persons or committees within Curtiss-Wright possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision." *Id.* at 85.  The Court went on to note that if the amendment was found not to have been  properly adopted or authorized, "the question would then arise whether any subsequent actions, such as the executive vice president's letters informing respondents of the termination, served to ratify the provision *ex post*." *Id.* (citing 2 W. Fletcher, Cyclopedia of the Law of Private Corporations § 437.10, pp. 386 (1990)).  The Tenth Circuit has also acknowledged that "*ex post* events might ratify a company's intended amendment to a plan." *Allison v. Bank One-Denver*, 289 F.3d 1223, 1236 (10th Cir. 2002) (citing *Curtiss-Wright*, 514 U.S. at 85).  The Tenth Circuit cautioned, however, that "informal communications, whether they be oral or written, frequently will lack sufficient indicia of intent to amend." *Id.* (declining to determine "the cobbled-together collection of meeting minutes and informal communications" qualified as an amendment to the express terms

---

[17] "'ERISA is, in its most important dimension, federal trust law. Substantively, the statute . . . absorbs the core fiduciary duties of loyalty and prudence from trust law and extends them to govern all aspects of plan administration.'" *Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919, 925 (10th Cir. 2006) (quoting John L. Langbein, *What Erisa Means by "Equitable": The Supreme Court's Trail of Error in Russell, Mertens, and Great-West*, 103 Colum. L. Rev. 1317, 1319 (2003)).

of a plan).

(March 31, 2009 Order, Docket No. 152 at 10–11.)

I conclude, just as I did with respect to the reduction in benefits for post-1990 occupations retirees, that no question of fact remains regarding whether the PDC amended the Plan with respect to the Life Benefit for pre-1991 retirees.  Indeed, the process by which Qwest amended the Plan for the pre-1991 retirees was essentially identical to the process by which Qwest amended the Plan for the post-1990 occupational retirees.

As in *Curtiss-Wright*, Qwest, indisputably acting through the PDC, could amend the Plan in any manner which "sufficiently manifested its intention" to amend.  *See Curtiss-Wright*, 514 U.S. at 80 (quoting Restatement (Second) of Trusts § 331, comment c (1957)).  First, the September 2006 Resolutions themselves were clear that the intent of PDC was to amend the Plan to reduce the Life Benefit for pre-1991 retirees as the document stated "the Plan is and hereby is amended."  Furthermore, Qwest manifested its intent to amend the Plan in many additional ways including reducing the Life Benefit with Prudential pursuant to the September 2006 Resolutions, notifying the affected Plan Participants of the change in benefits via a formal SMM and the Pre-1991 Guide, and conducting itself as if the September 2006 Resolutions constituted an amendment to the Plan.  Although the PDC may have taken further steps to formalize the benefit changes for post-1990 occupational retirees by executing Amendment 2006-1, contrary to Plaintiffs' assertion, it was not required to take these steps to effectuate an amendment to the Plan.  Indeed, I note again that all that was required was a manifestation of intent to amend—a requirement that was satisfied by numerous actions

24

as discussed above.  Therefore, I conclude that the PDC, the entity with authority to amend the Plan, amended the Plan to provide a reduced $10,000 life insurance benefit for all pre-1991 retirees.

Moreover, I conclude that the same actions by Defendants which manifested their intent to amend the Plan also served to ratify the amendment to the Plan. Although "informal communications" may be insufficient to ratify a plan amendment if they do not sufficiently indicate the intent to amend, *see Allison*, 289 F.3d at 1236, Defendants' actions here clearly indicate an intent to amend.  As noted above, following the September 2006 Resolutions, Defendants told Prudential to reduce the Life Benefit effective January 1, 2007, sent an SMM to Plan Participants notifying them of the reduction in benefits, and administered the Plan with reduced benefits.  These actions sufficiently indicate the intent to amend and served to ratify the September 2006 Resolutions.

Plaintiffs present similar arguments that the Plan was never validly amended for the pre-1991 retirees as it did with respect to Claims 3 and 5 including that the doctrine of *contra proferentem* is applicable here, that the Group Contract with Prudential was not validly amended to reflect the reduction in benefits, and that the September 2006 Resolutions were not "adopted" within the meaning of the Prior Loss Proviso.  Just as I concluded that these arguments were unpersuasive with respect to Claims 3 and 5, I conclude they are unpersuasive with respect to Claim 6.

First, although the doctrine of *contra proferentem* is not applicable in ERISA cases where the plan administrator retains discretion, it is applicable in ERISA cases when the court is "reviewing an ambiguous ERISA plan de novo."  *Miller*, 502 f.3d at

1253.  In this case, however, I find no such ambiguity.  Plaintiffs allege that the

September 2006 Resolutions, if considered an amendment, creates an internal

inconsistency in the 1998 Plan documents because the 1998 Plan documents include a

more favorable Life Benefit description.  This does not create an ambiguity, however,

because there is no requirement in the plan amendment procedure that an amendment

strike inconsistent language in the governing documents.  As I previously noted, the

very purpose of an amendment is to replace or supplement the prior language.

Therefore, I again decline to conclude that leaving the previous language in place

creates an ambiguity when, as here, the amendment unambiguously supplants the

previous language.  Thus, *contra proferentem* is not applicable and the September 2006

Resolutions control as a valid amendment to the Plan.

Second, whether Qwest met its obligations with respect to the Group Contract

with Prudential is irrelevant for purposes of Claim 6.[18]  Claim 6 alleges that the reduction

in benefits for pre-1991 retirees was in violation of the Prior Loss Proviso because there

was never a valid Plan amendment.  However, I have already determined that there

was a valid Plan amendment.  The amendment procedure for the Plan does not require

execution of a valid amendment of the insurance contract.  Therefore, whether Qwest

complied with the terms of the Group Contract by executing a signed amendment to that

document is irrelevant to whether Qwest executed a valid amendment to the plan

---

[18]  There is some indication that Qwest did meet its obligation as the Prudential
contract required either an amendment signed by both parties or a rider signed by
Prudential.  Qwest alleges that it met the obligations under the Group Contract with
Prudential by executing February 7, 2007 rider, which was signed by Prudential.
However, as I conclude that this issue is irrelevant to a determination of Claim 6, I need
not decide whether this fulfilled Qwest's obligations.

documents governing the Life Benefit.[19]

Finally, I again conclude that Plaintiffs' argument that the September 2006 Resolutions or the June 2007 Resolutions were not "adopted" within the meaning of the Prior Loss Proviso has no merit.  As the term "adopted" is not defined in the 1998 Plan Documents it must be given its "'common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean.'"  *See Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119, 1123 (10th Cir. 2004) (quoting *Blair v. Metro Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992)).  As I have previously determined, to "adopt", as the word is commonly used in this context, is defined as "to take up (a practice, method, word, or idea) from some one else"; "to embrace, espouse" or "to approve, to confirm (accounts, reports, etc.)", Oxford English Dictionary (2d ed. 1989); or "to accept formally and put into effect", Webster's New Collegiate Dictionary 16 (1974).  Amending the Plan, either via the September 2006 Resolutions, any other actions evidencing Qwest's intent to amend the Plan, or ratification of the Plan, is plainly an "adoption" of the reduction in benefits as the change was accepted, put into effect, and confirmed.  Furthermore, the fact that the amendment may have been "ratified" rather than formally "adopted" is not determinative as the reduction in benefits was clearly approved or accepted.

---

[19]  Although not argued by Plaintiffs in reference to Claim 6, I again note that any argument that Qwest failed to "act in accordance with the documents and instruments governing the Plan", as required by ERISA, 29 U.S.C. § 1104(a)(1)(D), is not a part of Claim 6 and, therefore, not appropriately addressed here. (*See* March 31, 2009 Order on Motions for Summary Judgment, Docket No. 152 at 16; August 25, 2009 Order on Motion for Reconsideration (Docket No. 158).)

Therefore, there remains no question of fact as to whether the reduction of the Life Benefit for pre-1991 retirees was adopted by at least January 1, 2007, the date the change first became effective.  Indeed, I have concluded that the September 2006 Resolutions amended the Plan by its express language and Qwest manifested its intent to amend and ratified the amendment in September 2006 by effectuating the September 2006 Resolutions and in October 2006 by notifying all Plan Participants of the change through an SMM and the 2007 Pre-1991 Guide.  Therefore, given these rulings, Claim 6 is without any basis and must be dismissed.

3.    Claim 8

Plaintiffs' Eighth Claim alleges that the Qwest Employee Benefits Committee ("EBC") violated ERISA by failing to timely produce certain documents in response to Plaintiff Phelps's written request and requests penalties of up to $110 per day. Pursuant to 29 U.S.C. § 1024(b)(4), a plan administrator is required to, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  A plan administrator who fails to abide by section 1024(b)(4) within thirty days of the request may be held personally liable for up to $100 per day for each day of the violation "in the court's discretion."[20]  29 U.S.C. § 1132(c)(1)(B).  The court may also "in its discretion order such other relief as it deems proper."  *Id.*  In exercising such discretion, a court may consider prejudice to the plaintiffs from the delay

---

[20]  Plaintiffs allege that section 1132(c)(1)(B) authorizes penalties up to $110 (rather than $100) per day.  The statute, however, indicates a maximum penalty of $100 per day.

in or failure to obtain the documents, bad faith on the part of the plan administrator in failing to produce the documents, and the extent of the failure. *See Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000).

In this case, the undisputed facts demonstrate that the EBC received a section 1024(b)(4) request from Plaintiffs' counsel Curtis Kennedy, Esq. ("Kennedy") on behalf of Phelps and other Qwest retirees relating to the Life Plan (the "Life Plan Request"). The EBC responded to the request on December 18, 2006 (the "Life Plan Response") by providing the 1998 Plan Documents and more than 40 other documents totaling 869 pages. According to Defendants, the EBC realized in May 2008 that the September 2000 Resolutions also amended the Life Plan and, therefore, provided the document on May 29, 2008. Plaintiffs allege that even when provided in May 2008, over eighteen months later, the document was heavily redacted and, therefore, does not adequately respond to the Life Plan Request. There is no dispute, however, that the amendment executed by the September 2000 Resolutions solely applied to non-union employees and did not apply to Phelps or other Qwest employees on whose behalf Kennedy submitted the Life Plan Request.

In their response to Defendants' motion for summary judgment, Plaintiffs allege that the EBC also failed to provide three additional documents in response to the Life Plan Request: (1) the attachment to Plan Amendment 2004-1; (2) the minutes and resolutions of the PDC dated December 13, 2006; and (3) the written amendment executed by both Qwest and Prudential amending the terms of Group Policy Contract G-93634. Defendants contend that Plan Amendment 2004-1 does not have an attachment and, therefore, the EBC cannot produce one. Similarly, Defendants also

29

contend that at the time of the Life Plan Request and Response, the February 7, 2007 Amendment/Rider was not in existence and there is no amendment that is signed by both Qwest and Prudential.  Defendants did, however, produce the Restated Group Contract between Qwest and Prudential in December 2006 and later timely produced the two-page February 7, 2007 Amendment/Rider after it was executed.  (*See* Phelps Aff., Docket No. 125-3 ¶ 22 (admitting that Qwest produced the February 7, 2007 Amendment/Rider).)  Finally, Defendants argue that the December 13, 2006 minutes consist of three pages: two that did not exist at the time of the Life Plan Response and one that is merely a summary of another document that was produced—Amendment 2006-1.  Furthermore, it is undisputed that the three pages were produced on January 8, 2008.

Exercising my discretion I conclude that no penalties are warranted by Defendants' actions in this case.  Defendants have provided sufficient evidence that Qwest was unable to produce either the attachment to Amendment 2004-1, the written amendment between Qwest and Prudential, or the first two pages of the December 13, 2006 minutes in their Life Plan Response as these documents did not exist at the time of the Life Plan Response.  Therefore, failure to provide these documents was not a violation of section 1024(b)(4).  With respect to the other two documents—the September 2000 Resolutions and the third page of the December 13, 2006 minutes—I conclude that no penalties are warranted even though they were not produced in accordance with section 1024(b)(4).  Plaintiffs suffered no prejudice from the failure to produce these documents.  Indeed, Plaintiffs do not allege that they suffered any prejudice from the delayed disclosure of the September 2000 Resolutions.

Furthermore, there is no dispute that the September 2000 Resolutions did not relate to any of the Plaintiffs in this lawsuit.[21]  With respect to the December 13, 2006 minutes, Plaintiffs allege that the delayed disclosure caused them to be unable to determine the date of the PDC's adoption of Amendment 2006-1.  However, as it is undisputed that Amendment 2006-1 itself references its adoption date (*see* Docket No. 125-5 at 8) and that this was timely produced in the Life Plan Response, Plaintiffs could not have been prejudiced in this manner by the delay of the third page of the December 13, 2006 minutes.

There is no evidence that Defendants failed to comply with section 1024(b)(4) in bad faith.  Defendants timely responded to the Life Plan Request, disclosing a number of documents totaling some 869 pages.  Although they apparently overlooked disclosing two documents, one of which is apparently a summary of another document that was timely disclosed, they disclosed these documents when they discovered their error.  Furthermore, I note that the documents that Defendants failed to disclose represent a very small portion of the total amount of documents that Defendants were required to disclose pursuant to the Life Plan Request.  *See Deboard*, 208 F.3d at 1244; *Macklin v. Ret. Plan for Employees of Kan. Gas & Elec. Co.*, 99 F.3d 1150, 1996 WL 579940, at *4 (10th Cir. Oct. 9, 2006) (unpublished) ("Thus, the district court was accurate in characterizing the Company Plan's compliance with ERISA § 104 as 'substantial,' and was well within its discretion in denying Mr. Macklin's claim for statutory penalties.").  Given all these considerations, Defendant's disclosures were substantial, and in my

---

[21]  I also note that Plaintiffs allegations that this document was redacted is not persuasive as Defendants have attested that the redacted portions do not relate to the Life Plan, which was the subject of the Life Plan Request.

discretion, no penalties are warranted for Defendants' failures with respect to the Life Plan Request and Response.

Accordingly, it is ordered:

1.     Defendants' Motion for Summary Judgment on Plaintiffs' Second Claim for Relief (Docket No. 107), filed September 12, 2008, is granted.

2.     Defendants' Motion for Summary Judgment on Plaintiffs' Sixth, Seventh, and Eighth Claims for Relief (Docket No. 108) is granted with respect to Plaintiffs' Sixth and Eighth Claims and denied as moot with respect to Plaintiffs' Seventh Claim.

3.     Claims 2, 6, and 8 are dismissed with prejudice.

4.     As no claims remain pending, this case is dismissed with prejudice.

DATED at Denver, Colorado, on August 25, 2009.

BY THE COURT:

s/ Walker D. Miller
United States District Judge